UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 09-10569-RGS

JUAN ESPINAL

v.

NATIONAL GRID NE HOLDINGS 2, LLC and
KEYSPAN NEW ENGLAND, LLC

MEMORANDUM AND ORDER ON DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT

May 13, 2011

STEARNS, D.J.

On June 4, 2009, plaintiff Juan Espinal, a service technician at defendants' Beverly yard, filed this Amended Complaint against his employers of almost ten years, National Grid NE Holdings 2, LLC (National Grid) and Keyspan New England, LLC (Keyspan) (collectively, defendants).[1] Espinal alleges discrimination, hostile work environment, and retaliation under state and federal law. He also seeks equitable relief and damages under state and federal law, including the payment of his attorneys' fees and costs. On January 7, 2011, defendants filed this motion for summary judgment. A hearing on the motion was held on March 17, 2011.

---

[1] National Grid is a public utility engaged in the sale and distribution of natural gas to residential, commercial, and industrial customers. The two named defendants are wholly owned subsidiaries of Keyspan Corporation.

BACKGROUND

The material facts in the light most favorable to Espinal as the nonmoving party are as follows. In December of 2001, Espinal began working as a Meter Service Technician at Keyspan (now known as National Grid). Espinal was responsible for investigating reports of gas leaks. His regular shift ran Tuesday through Saturday, 4:00 p.m. to midnight. Each month, Espinal was also assigned to on-call gas leak detection duty for one week. While on-call, he was responsible for responding to pages from midnight to 8:00 a.m., during which time Espinal was the only technician at the Beverly yard available to respond to gas leak emergencies.[2]

On March 17, 2004, while he was on-call, Espinal did not respond to a page at 6:25 a.m. As a result, he received a verbal warning from his supervisors, Scott Crooker and Louis Laghetto. On September 1, 2004, Espinal again failed to respond to a page, this time at 5:28 a.m. Defendants allege that Espinal was paged a second time within ten minutes and also called at home, but that his home telephone had been disconnected.[3] After a September 3, 2004 disciplinary meeting with Crooker and

---

[2] The Massachusetts Department of Public Utilities requires that a National Grid employee arrive at the location of a reported gas leak within sixty minutes of the report.

[3] Espinal claims that the dispatcher had called a home phone number that had been disconnected seven months before. He further alleges that he had given his employer his new home telephone number. Defendants, however, dispute this.

Michael Verrell, the dispatch supervisor, Espinal was suspended for five days.[4]

On July 10, 2005, a dispatcher mistakenly paged Espinal when he was not assigned to on-call duty. Espinal speculated that another technician had failed to answer the page and asked his Union to obtain records from National Grid, although he did not explain the reason for the request. Espinal Dep. 26: 15-23; 27: 1-7. On July 19, 2005, Espinal complained to the Union about discriminatory treatment. Espinal claims the Union immediately contacted management. Defendants, however, insist that they only learned of the complaint from Mark MacDonald, a Union official, on December 22, 2005, some five months after Espinal asked the Union to intervene. Mark Eagan, a Manager of Industrial Relations, then met with Espinal to discuss his complaint. Eagan then undertook an investigation that included a review of all calls and pages sent to the three employees on duty on July 10, 2005, as well as dispatch reports and other company communications records.

After assembling the records, Eagan attempted to schedule a meeting with Daniel Racki, one of the three employees identified as having been on duty on July 10, 2005. A number of scheduled meetings, however, were canceled over the next several months because of illnesses, work emergencies, and military obligations. When Eagan

---

[4] Espinal contends that the suspension was unduly harsh because it was treated as if it were his second offense, despite the fact that the verbal warning had been withdrawn by Crooker after the Union challenged it.

finally met with Racki on September 14, 2006, Racki stated that he did not recall missing a page on July 10, 2005. During the interview, Racki mentioned his personal cell phone, which prompted Eagan to review company records related to that phone as well. Finally, Eagan interviewed the dispatchers who were on duty on the night of July 10, 2005. In October of 2006, Eagan determined that it was Racki who had failed to respond to the July 10, 2005 page, and as a result, suspended him for five days.

On September 27, 2006, Espinal filed a Charge of Discrimination with the Massachusetts Commission Against Discrimination (MCAD). In November of 2006, after learning of Racki's suspension, Espinal's coworkers, most of whom like Racki were white,[5] gave him a "rough night" following a Union meeting (held off company premises and after company hours). Espinal alleges that his coworkers screamed at him, calling him a "rat" and a "Spic" and accusing him of "outing" Racki and compounding matters by filing a charge with the MCAD. Following this incident, Eagan and William Costigan, the Manager of the Beverly yard, met with Espinal and Union officials. Espinal, however, refused to reveal the identities of the alleged harassers and walked out of the meeting.

On December 25, 2006, Espinal found the words "the rat" scrawled across his

---

[5] Of approximately 120 employees in the Beverly yard, roughly 6 percent were members of racial minority groups.

company vehicle. When Espinal reported the vandalism, Robert Preshong, another Manager of Industrial Relations, met with him to investigate. Espinal again refused to reveal the names of any coworkers who had harassed him. Preshong gave Espinal his personal cell phone number and instructed Espinal to call him directly if another incident occurred. Espinal never called.

On January 5, 2007, Eagan and Costigan held a meeting with the members of the Union to reiterate the company's zero tolerance policy for workplace harassment and the damaging of company property. Eagan made clear that anyone responsible for either type of misconduct would be terminated. Espinal alleges that to this day, coworkers continue to call him a "rat" to his face and publicly berate him for betraying a Union "brother." Espinal, however, has not reported any incidents of harassment to the company since his truck was vandalized.

On February 15, 2007, Crooker investigated Espinal's response to a call about an odor of gas at 8 South Street in Salem. Espinal reported a Grade 1 gas leak and waited for a crew to arrive to fix the leak. After Espinal left the site, two other technicians were dispatched. Their readings were much higher and covered a larger area. When Crooker personally visited the site, two different complaining customers told him that Espinal had not come to their doors, and one reported having seeing

Espinal idling in his truck outside her house all morning.[6] Crooker could not find any footprints or pogo holes at 3, 6, and 9 South Street, the locations where Espinal had claimed to have done investigations at the foundation walls.[7] As a result, Espinal was suspended for five days for an improper leak investigation. The Union filed a grievance on Espinal's behalf, and the suspension was eventually replaced with non-disciplinary coaching and counseling.

Less than a year later, on January 23, 2008, Espinal filed a second MCAD charge alleging retaliation and discriminatory and retaliatory harassment. Although Eagan attempted to pursue Espinal's new charge with the Union and with Espinal personally, Espinal's attorney informed him that Espinal would not agree to meet with him.

Four months after Espinal filed his second MCAD charge, Kevin Curry, a night-shift supervisor, became concerned when he noticed that Espinal was taking an excessive amount of time to complete a simple task – shutting the gas off at a customer's home. Curry attempted to contact Espinal, but he did not respond. When

---

[6] For his part, Espinal contends that one of the customers never answered the door, while another was not home when he knocked.

[7] Espinal contends that Crooker's inability to see footprints and pogo holes can be explained by the presence of frozen snow, falling leaves, debris, and Crooker's failure to bend down close enough to the ground.

Curry proceeded to the jobsite, but he did not find Espinal there. He then drove to Espinal's next jobsite, but arrived before Espinal. After questioning Espinal, Curry returned to the first jobsite and conducted a post-check. He determined that Espinal had performed the work satisfactorily and took no further action. In April of 2008, Espinal took disability leave. He returned to work in October of 2008.

On January 25, 2009, a fatal gas explosion occurred at 76 Eastern Avenue in Gloucester, MA. The explosion prompted the Mayor to request information from the city Fire Department regarding gas odor reports. In turn, the Fire Department asked National Grid for information regarding its response to three reports of possible gas leaks, including a December 26, 2008 call regarding 75 Eastern Avenue. That day, Espinal had been dispatched to investigate a reported leak at 275 Eastern Avenue. When Espinal was unable to find the address, his dispatcher contacted the Gloucester Fire Department, which corrected the address to 75 Eastern Avenue. According to National Grid, the dispatcher then made a 23-second call to Espinal.[8] The dispatcher also issued an electronic order modification, which should have caused a pop-up message to appear on Espinal's van monitor.[9] Espinal insists that the dispatcher did not

---

[8] The two dispatchers on duty that night do not recall whether either of them told Espinal the correct address during the call.

[9] Espinal testified at his deposition that he does not recall whether he ever received the corrected address by way of a pop-up message. Espinal Dep. 167: 4-8.

7

update the address during the call, but that he nonetheless proceeded on his own initiative to the last building on Eastern Avenue at number 224.[10] According to National Grid, the mapping system in Espinal's vehicle would have shown him that there were no gas lines within 3,800 feet of 224 Eastern Avenue.[11] On April 15, 2009, Espinal was suspended for thirty days for failing to respond properly to the report of the Eastern Avenue gas leak.

Espinal alleges that because of the taunting, he has had to reduce his overtime assignments to avoid coworkers, has stopped attending Union meetings, and has had to take disability leave to seek therapy. He also alleges that his family relationships have suffered as a result. As will be explained, defendants' motion for summary judgment will be allowed.

DISCUSSION

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A 'genuine' issue is one that could be resolved

---

[10] Number 224 is on the even side of the street some fifty house numbers from number 275.

[11] Espinal asserts that there are some abandoned gas mains in the area of number 224 that do not appear on the company's maps or that gas might have permeated undetected through the subsoil.

in favor of either party, and a 'material fact' is one that has the potential of affecting the outcome of the case." *Calero-Cerezo v. U.S. Dep't of Justice*, 355 F.3d 6, 19 (1st Cir. 2004), citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-250 (1986).

*Discrimination*

To determine whether a plaintiff has successfully established a discrimination claim, federal and state courts rely on the burden-shifting analysis set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Conward v. Cambridge Sch. Comm.,* 171 F.3d 12, 19 (1st Cir. 1999); *Abramian v. President & Fellows of Harvard Coll.*, 432 Mass. 107, 116 (2000). At the first step, a plaintiff must adduce a prima facie case of discrimination, showing that: (1) he is a member of a protected class; (2) he was performing at an adequate level; and (3) he suffered an adverse employment action.[12] If the plaintiff succeeds in establishing a prima facie case, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for the adverse employment action. The onus is not onerous. "In assessing pretext, a court's 'focus must be on the perception of the decision maker,' that is, whether the employer

---

[12] Defendants' suggestion that Espinal must also show as part of his prima facie case that other similarly situated coworkers who are not within the protected class were treated more favorably is not entirely accurate. Comparative evidence regarding the treatment of similarly situated persons in a disparate treatment case is considered at the third step of burden-shifting. It is not an element of a plaintiff's prima facie case. *Conward*, 171 F.3d at 19.

9

believed its stated reason to be credible." *Mesnick v. Gen. Elec. Co.*, 950 F.2d 816, 824 (1st Cir. 1991). "The employer's reasons need not be wise, so long as they are not discriminatory and they are not pretext." *Tardanico v. Aetna Life & Cas. Co.*, 41 Mass. App. Ct. 443, 448 (1996). If the employer passes the test, a plaintiff must come forward with evidence showing that the employer's proffered reason is a pretext and that a discriminatory animus was at the heart of the employer's actions. "Despite these shifting burdens of production, the plaintiff throughout retains the burden of persuasion." *Conward*, 171 F.3d at 19.

Defendants argue that Espinal has failed to meet his burden at the prima facie stage of proof because he has not, and cannot, show that he was performing his job at an acceptable level. At issue are the verbal warning Espinal received for failing to respond to the March 17, 2004 page, the five-day suspension Espinal received later that year for failing to respond to the September 1, 2004 page, and the thirty-day suspension he received in 2009 for mishandling the gas leak investigation at 75 Eastern Avenue in Gloucester. Generally speaking, whether an employee is performing his job satisfactorily is a question of fact for the jury. *Boothby v. Texon, Inc.*, 414 Mass. 468, 481 (1993). Nonetheless, where material facts are not in dispute, summary judgment may be awarded even in cases where disparate treatment is alleged. *See Conward*, 171 F.3d at 20.

With respect to the March 2004 sanction, Espinal's rebuttal mainly consists of his lawyer's assertion in the pleadings (Statement of Facts) that Espinal never received the page because his company pager was broken. However, statements contained in a memorandum or lawyer's brief are insufficient for summary judgment purposes to establish a dispute of material fact. *Corrada Betances v. Sea-Land Serv., Inc.*, 248 F.3d 40, 43-44 (1st Cir. 2001). During his deposition testimony in March of 2010, in discussing the incident, Espinal admitted, "I did miss a page." Espinal Dep. 19: 14-16.

With respect to the missed September of 2004 page, Espinal by way of an affidavit filed with his opposition to summary judgment, asserts that he never received the page.[13] The assertion, however, is contradicted by his deposition testimony in which he stated that he did not remember whether his pager "went off." Espinal Dep. 22: 21-23. *See I.V. Servs. of Am., Inc. v. Inn Dev. & Mgmt., Inc.*, 182 F.3d 51, 55 (1st Cir. 1999) (a professed lack of recollection does not raise a legitimate dispute of material fact). *See also Colantuoni v. Alfred Calcagni & Sons, Inc.*, 44 F.3d 1, 4-5 (1st

---

[13] In an Inter-Office Memo regarding Espinal's suspension dated September 3, 2004, Crooker told Costigan that during his interview with Espinal about the missed pages and the unanswered phone call, Espinal claimed that his pager must not have been working properly. Crooker did not deem Espinal's excuse to be credible, however, because Espinal admitted to having received a page from Laghetto that same morning.

Cir. 1994) ("When an interested witness has given clear answers to unambiguous questions, he cannot create a conflict and resist summary judgment with an affidavit that is clearly contradictory, but does not give a satisfactory explanation of why the testimony is changed."); *Orta-Castro v. Merck, Sharp & Dohme Quimica P.R., Inc.*, 447 F.3d 105, 110 (1st Cir. 2006) (affidavit that was inconsistent with deposition testimony surfaced only after a motion for summary judgment was filed). Espinal's explanation of his performance during the leak investigation at 75 Eastern Avenue in Gloucester in 2009, is even more convoluted (as related earlier), but as defendants point out, Espinal admits that he never reported to 75 Eastern Avenue. Instead, after being unable to locate the correct address, he proceeded on his own to an address some 3/4 of a mile away from the nearest viable gas line and more than 50 street numbers away from the location that he was called to inspect.

This raises the third prong of Espinal's prima facie case, whether he in fact has shown that he was the subject of an "adverse employment action." An adverse employment action is a "tak[ing] of something of consequence from the employee, say, by discharging or demoting her, reducing her salary, or divesting her of significant responsibilities, or withhold[ing] from the employee an accouterment of the employment relationship . . . ." *Blackie v. Maine*, 75 F.3d 716, 725 (1st Cir. 1996) (internal citation omitted). The term is expansive enough to include, as here, a

suspension from work, although perhaps it does not include a mere verbal reprimand. *See Sweeney v. West*, 149 F.3d 550, 556 (7th Cir. 1998) ("This circuit already has concluded that negative performance evaluations, standing alone, cannot constitute an adverse employment action."). In employment law, the term "adverse employment action" is one of art that carries a connotation not simply of workplace discipline, but of discipline unfairly (and discriminatorily) imposed.

Here, the discipline of which Espinal complains, while it meets the definitional aspect of "adverse" was inexorably linked to his poor performance – he missed two on-duty pages in September of 2004, and no matter what credit one gives to his attempt at an explanation, he completely botched (and potentially dangerously so) the investigation of the 75 Eastern Avenue gas leak in 2009. While the fact that the discipline imposed appears by any account to have been reasonable and merited goes more to the second and third stages of the burden-shifting analysis, it does reflect as well on the plausibility of Espinal's claim that he was performing his job adequately. Because Espinal has failed to show a prima facie case of job discrimination, defendants' motion for summary judgment on Espinal's discrimination claim will be allowed.[14]

---

[14] Defendants make an equally plausible argument that even if Espinal had succeeded in making out a prima facie case of discrimination, he cannot show that the discipline was pretextual. Merely asserting that workplace discipline is attributable to

13

*Hostile Work Environment*

A plaintiff may recover on a hostile work environment theory when "the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (internal citation and quotations omitted). To establish a prima facie case of coworker harassment on the basis of race, Espinal must demonstrate that: (1) he is a member of a protected class; (2) he was harassed on the basis of his membership in that protected class; (3) the harassment was sufficiently severe and pervasive so as to alter the conditions of employment and create an abusive working environment from the perspective of a reasonable person in plaintiff's position; and (4) the defendants knew or should have known about the harassment and failed to take prompt remedial action. *See Sarin v. Raytheon Co.*, 905 F. Supp. 49, 52 (D. Mass. 1995). *See also Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 66-73 (1986). "[W]hether an environment is

---

a plaintiff's race is insufficient to establish pretext. *See, e.g.*, *Mariani-Colón v. Dep't of Homeland Sec.*, 511 F.3d 216, 224 (1st Cir. 2007). As defendants argue, Espinal cannot show that similarly situated white technicians were treated any differently for committing the same infractions, citing the intensive effort undertaken by Eagan to ferret out Racki as the culprit who had failed to respond to the July 10, 2005 page, and who received the same five-day suspension as Espinal. With respect to the 2009 disciplinary action, defendants point out that Espinal has no valid point of comparison because no other individuals investigated in connection with the Gloucester explosion were found to have acted improperly.

'hostile' or 'abusive' can be determined only by looking at all of the circumstances. These may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance. . . . [W]hile psychological harm, like any other relevant factor, may be taken into account, no single factor is required." *Harris*, 510 U.S. at 23.

"A plaintiff must satisfy different standards for establishing employer liability in a hostile work environment case depending on whether the harasser is a supervisor or co-employee of the victim." *Crowley v. L.L. Bean, Inc.*, 303 F.3d 387, 401 (1st Cir. 2002). When coworkers, rather than supervisors, are responsible for perpetuating a hostile work environment, "an employer can only be liable if the harassment is causally connected to some negligence on the employer's part." *Noviello v. Boston*, 398 F.3d 76, 95 (1st Cir. 2005).

Defendants argue that the harassment alleged by Espinal is not actionable as a matter of law because the objectionable conduct primarily occurred off company property and outside of work hours, and when company managers received word of Espinal's complaint, they responded promptly and appropriately by warning employees of the company's zero tolerance policies and by threatening the termination of any

employee found in violation of those policies.[15] Against this backdrop must also be weighed Espinal's persistent refusals to co-operate with his managers' attempts to identify those who were responsible for the harassing conduct.[16] Espinal was asked multiple times to name the coworkers who were reportedly harassing him. Espinal, however, rebuffed every request.

An employer will be held liable for coworker harassment only if, after receiving notice, it fails to undertake adequate remedial measures. *Forrest*, 511 F.3d at 231. Notice is critical. As the First Circuit recently observed, a plaintiff's failure to put a defendant on notice of renewed harassment after the employer has made reasonable efforts to address the initial complaint may vitiate a claim of employer liability in the hostile work environment context. *See Wilson*, 2011 WL 977528, at *8 (plaintiff's failure to contact a senior executive who had instructed him to lodge any future

---

[15] Verbal warnings are generally recognized as a first step consideration when assessing the appropriateness of an employer's response to a claim of coworker harassment. *See, e.g.*, *Forrest v. Brinker Int'l Payroll Co., LP*, 511 F.3d 225, 231-232 (1st Cir. 2007). "In most situations . . . the imposition of employee discipline is not a rote exercise, and an employer must be accorded some flexibility in selecting condign sanctions for particular instances of employee misconduct." *Wilson v. Moulison North. Corp.*, 2011 WL 977528, at *5 (1st Cir. Mar. 21, 2011).

[16] Espinal claims that he was called a "Spic" and a "rat" almost daily, his company car was defaced at work, and that he was even once threatened with physical violence. During the hearing, defendants argued that they were never specifically told of the use of any racial epithets against Espinal. They do acknowledge that Espinal reported the defacing of his company vehicle with the graffito.

complaints of harassment with the executive personally was fatal to plaintiff's claim). Here, as in *Wilson*, Preshong, a senior manager, gave Espinal his personal cell phone number and told Espinal to call him if any further harassment occurred. Espinal never did. Defendants' motion for summary judgment on Espinal's hostile work environment claim will be allowed.

### *Retaliation*

To make out a claim for retaliation, a plaintiff must point to specific facts that show that: (1) he engaged in conduct protected by statute; (2) he was subjected to an adverse employment action after the protected conduct occurred; and (3) there was a causal link between the protected conduct and the adverse employment action. *See Valentín-Almayda v. Municipality of Aguadilla*, 447 F.3d 85, 94 (1st Cir. 2006); *Mole v. Univ. of Massachusetts*, 442 Mass. 582, 591-592 (2004).

In this case, Espinal characterizes four of defendants' actions as retaliatory: (1) his suspension for a poor leak investigation at 8 South Street in 2007; (2) Curry's supervisory onsite inspection of his work on April 25, 2008; (3) the suspension imposed for the poor leak investigation of 75 Eastern Avenue on December 26, 2008; and (4) defendants' alleged "deliberate inaction" in response to harassment by his fellow Union members.

Defendants reply that, as a matter of law, the 8 South Street investigation and

Curry's supervisory actions cannot be considered retaliatory because neither resulted in an adverse employment action. An adverse employment action must be something of a concrete nature that materially disadvantages a plaintiff. *See LaRou v. Ridlon*, 98 F.3d 659, 664 (1st Cir. 1996); *MacCormack v. Boston Edison Co.*, 423 Mass. 652, 662 (1996). The 8 South Street suspension was withdrawn and non-disciplinary counseling substituted in its stead. Curry, in conducting a supervisory check of Espinal's work, was exercising a management prerogative, and in any event, he concluded that Espinal's work on that occasion was satisfactory, so no disciplinary measures were taken.

With respect to the thirty-day suspension that followed the leak investigation of 75 Eastern Avenue, defendants make the point that the company inquiry that led to Espinal's suspension was undertaken in response to the request of the Mayor for National Grid's internal records. Espinal's MCAD charge had been filed over a year before. In showing a causal link between protected activity and an adverse employment action, a plaintiff must produce something more than a few weak inferences to surmount the summary judgment hurdle, particularly where events are widely separated in time. *Lewis v. Gillette Co.*, 22 F.3d 22, 25 (1st Cir. 1994). If temporal proximity is the only evidence establishing retaliation, the proximity must be "very close." *Bishop v. Bell Atl. Corp.*, 299 F.3d 53, 60 (1st Cir. 2002) (one-year gap

between protected activity and adverse action insufficient to show a causal link), quoting *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001) (per curiam); *see Mesnick*, 950 F.2d at 828 (1st Cir. 1991) (same, nine months); *Moron-Barradas v. Dep't of Educ.*, 488 F.3d 472 (1st Cir. 2007) (same, eight months). *See also King v. Hanover*, 116 F.3d 965, 968 (1st Cir. 1997) ("It is insufficient for [plaintiff] to simply recount that he complained and that he was disciplined five months later. He must offer sufficient evidence of discrimination for a rational factfinder to find in his favor.").

Finally, Espinal argues that defendants' toleration of a hostile work environment is cognizable as a retaliatory adverse action. *See, e.g.*, *Noviello*, 398 F.3d at 89. An employer, however, can only be liable for coworker retaliatory harassment if it knew or should have known about the harassment and failed to take corrective action. *Id.* at 94-95. Here, as previously explained, defendants took immediate and decisive action after receiving Espinal's original complaint, warning Union members of the company's zero tolerance policies and providing Espinal with the private cell phone number of a senior manager should he have further problems. Given Espinal's refusal to cooperate with the company's attempts to investigate the harassment, it is difficult to see what else could have been expected.

### ORDER

For the foregoing reasons, defendants' motion for summary judgment is

ALLOWED.  The Clerk will enter judgment for defendants and close the case.

SO ORDERED.

/s/ Richard G. Stearns

_____
UNITED STATES DISTRICT JUDGE